# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| DANNY MCDANIEL, | ) |
| PLAINTIFF, | ) ) ) |
| vs. | ) Case No. 4:18-cv-1697 PLC |
| ANDREW M. SAUL,[1] | ) ) ) |
| DEFENDANT. | ) |

## MEMORANDUM AND ORDER

Plaintiff Danny McDaniel seeks review of the decision by Defendant Social Security Commissioner Andrew Saul denying his application for a period of disability and Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's denial of Plaintiff's application.

**I.   Background and Procedural History**

In February 2015, Plaintiff, who was born in August 1952, filed an application for DIB alleging that he became disabled on November 5, 2014 as a result of "bladder cancer stage 1 waiting for treatment." (Tr. 110-11, 140) The Social Security Administration (SSA) denied Plaintiff's claim, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 87)

In February 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 24-42) In a decision dated July 2017, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 7, 2014, through the date of this decision[.]" (Tr. 10-17) Plaintiff filed a request for review of the ALJ's decision with the

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

SSA Appeals Council, which denied review. (Tr. 3-5) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence Before the ALJ

Plaintiff testified that he was sixty-four years old and a "career tow motor driver." (Tr. 28) Plaintiff most recently worked for fifteen years for the same company, where he "drove a forklift … in the shipping department." (Tr. 29) Plaintiff's job required him to lift "probably … 100 pounds at a time." (Id.)

Plaintiff testified that he underwent surgery for bladder cancer. (Tr. 30) When the ALJ asked Plaintiff "what kind of trouble" prevented him from working, Plaintiff testified that, since his surgery, "the biggest thing is running to the bathroom … when it hits me I got to go. And it might be a dozen times a day where it never done that before." (Tr. 31-32) Plaintiff was able to control his bladder "[n]ot every time, most of the time" and he generally wore adult incontinence undergarments, or Depends. (Tr. 32) Plaintiff explained that the incontinence was "not just leakage," but a full bladder void. (Id.) When this occurred, Plaintiff would not have to change his clothes, but would have to change his Depends. (Tr. 32-33) Plaintiff stated he experienced this type of incontinence ten to twelve times per day and did not believe he could "hold it" for two hours. (Tr. 33)

Plaintiff stated that pain and lack of strength in his left hand also prevented him from returning to work after the bladder surgery. (Tr. 34) Despite undergoing surgery in his left wrist, his left hand was about half as strong as his right hand and he could not hold anything with that hand for more than "a minute or two[.]" (Id.) When the ALJ asked Plaintiff how much weight he could carry, Plaintiff provided the following example: "… I was carrying groceries in here the

other day, the lighter bags I can pick up and go with no problem," but when he "grabbed [a larger bag with canned goods] and started, I can't do that, I had to get it with the other hand." (Tr. 35) Plaintiff testified that he had pain pills but "I won't take them unless it … really gets to hurting." (Tr. 37)

Finally, Plaintiff testified that back and right knee pain prevented him from working. (Tr. 36) Plaintiff stated that he last received treatment for his back in 2008 or 2010. (Id.) In regard to his right knee, Plaintiff explained that when he climbed stairs, he felt like it would "just give out[.]" (Tr. 38) Plaintiff stated that his knee hurt "once in a while" and he had not received treatment for it. (Id.)

The vocational expert testified that Plaintiff's past relevant work as a forklift driver, as performed, was classified as "heavy." (Tr. 41) When the ALJ asked the Plaintiff whether a hypothetical person "who has bladder difficulty and … needs a bathroom inside of two hours frequently" could maintain employment, the vocational expert answered: "No, he would need to be accommodated and that would not allow him to work competitively." (Id.)

With respect to Plaintiff's medical treatment records, the Court adopts the facts provided by Plaintiff in his statement of uncontroverted facts and admitted by the Commissioner. [ECF Nos. 19-1, 24-1] The Court also adopts the additional facts set forth in the Commissioner's "response to Plaintiff's statement of facts with additional material facts" because Plaintiff does not refute them. [ECF No. 24-1]

**III.     Standard for Determining Disability under the Social Security Act**

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423(a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as "the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

**IV.    The ALJ's Decision**

Applying the foregoing five-step analysis, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since November 7, 2014; and (2) had the severe impairments of "status post surgical removal of a malignant tumor from bladder, Bacuillus Calmette-Geurin therapy, and degenerative joint disease of the left hand" and non-severe impairments of vision problems and knee and back pain. (Tr. 12-13) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while his "medically determinable impairments could reasonably be expected to produce" the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 14) In regard to Plaintiff's urinary frequency and incontinence, the ALJ acknowledged that Plaintiff's testimony opinion of his treating urologist were "consistent with each other but inconsistent with the treatment record." (Tr. 15) The ALJ also found that Plaintiff could wear adult incontinence undergarments in the employment setting for his "occasional urinary incontinence."[2] (Tr. 15) As to Plaintiff's left hand impairment, the ALJ noted that, Plaintiff was "functional at home" and his treatment records did "not reflect ongoing significant complaints of pain or limitations." (Tr. 15-16)

The ALJ determined that Plaintiff had the RFC to perform "the full range of medium work as defined in 20 CFR 404.1567(c)." (Tr. 13) At step four of the sequential evaluation, the ALJ

---

[2] The ALJ opined that, "though potentially inconvenient at times, using an undergarment for occasional urinary incontinence would avoid having to work in close proximity to the bathroom at all times, avoid multiple extra bathroom breaks, and eliminate the risk of an embarrassing accident." (Tr. 15)

found that Plaintiff was able to perform his past relevant work as a fork lift driver. (Tr. 16) In the alternative, Plaintiff could perform other jobs that exist in significant numbers in the national economy." (Tr. 17) The ALJ therefore concluded that Plaintiff was not disabled. (Id.)

V.     Discussion

Plaintiff claims that substantial evidence does not support the ALJ's RFC determination because the RFC is conclusory and not supported by medical evidence. More specifically, Plaintiff argues that the record contains no medical evidence supporting the LJ's finding that Plaintiff could perform a full range of medium with no restrictions such as proximity to the bathroom or frequent bathroom breaks. [ECF No. 19] Additionally, Plaintiff argues that the ALJ "ignored [his] testimony without adequate explanation." [Id.] In response, the Commissioner asserts that the ALJ properly: (1) determined Plaintiff's RFC based on the treatment records and testimony; and (2) evaluated Plaintiff's creditability. [ECF No. 24]

RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 416.945(a)(1). An ALJ determines a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [her] limitations." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence

6

of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Plaintiff's medical records establish that, in November 2014, Plaintiff's urologist Dr. Bryan performed a "cystoscopy, transurethral resection of bladder tumor" and "[l]eft extracorporeal shockwave lithotripsy." (Tr. 189) At his post-operative follow-up appointments, Plaintiff complained to Dr. Bryan of urgency, frequency, and burning when he urinated. (Tr. 356, 350)

In January 2015, Dr. Bryan performed a "[r]estaging transurethral resection of bladder tumor." (Tr. 183-84) Approximately two weeks later, Plaintiff followed up with Dr. Bryan and reported occasional urgency and bladder spasm. (Tr. 347) In March 2016, Plaintiff presented to Dr. Bryan's office for Bacillus Calmette-Guerin (BCG) therapy.[3] (Tr. 344) When Plaintiff returned for his second BCG treatment about one week later, Dr. Bryan noted that Plaintiff was "doing well with no adverse side effects from medication." (Tr. 339) Plaintiff also requested a refill of pain medication, which he "only t[ook] before treatment." (Tr. 340) When Plaintiff saw his primary care physician later that month, he complained of anxiety and difficulty staying asleep due to his bladder problems. (Tr. 218)

Plaintiff received his last two BCG treatments in April 2015, and Dr. Bryan noted at both appointments that Plaintiff was "doing well." (Tr. 322, 326) In May 2015, Dr. Bryan performed a "surveillance cystoscopy and bladder biopsy." (Tr. 179) The surgical pathology report diagnosed: "urinary bladder, right later wall biopsy; acute and chronic inflammation." (Tr. 181)

---

[3] "Bacillus Calmette-Guerin or BCG is the most common intravesical immunotherapy for treating early-stage bladder cancer. It's used to help keep the cancer from growing and to help keep it from coming back." https://www.cancer.org/cancer/bladder-cancer/treating/intravesical-therapy.html

7

In September 2015, Dr. Bryan noted that Plaintiff noted that Plaintiff was "doing well has no urinary complaints" and performed another surveillance cystoscopy. (Tr. 205) Results revealed that Plaintiff's urine was nitrate positive and appeared infected. (Tr. 207) Dr. Bryan prescribed ciprofloxacin and instructed Plaintiff to return in two weeks. (Id.) Plaintiff underwent a flexible cystoscopy the following month and results were normal. (Tr. 204) Plaintiff had "no complaints" that day. (Tr. 202)

When Plaintiff followed up with Dr. Bryan in January 2016, Dr. Bryan noted that Plaintiff was "doing well." (Tr. 199) In May 2016, Plaintiff had a negative urinalysis and negative cystoscopy. (Tr. 197) At Plaintiff's next follow-up appointment in December 2016, Dr. Bryan noted that Plaintiff: completed BCG therapy one and half years ago; he was "doing well and has no urinary complaints today"; and continued to take tamsulosin. (Tr. 152) Dr. Bryan performed a cystoscopy, which revealed no abnormalities. (Tr. 154)

Although Plaintiff's last treatment records from Dr. Bryan are dated December 2016, Dr. Bryan wrote a letter in April 2017 stating he was currently treating Plaintiff "for several urological issues including frequency, urge incontinence and urgency." (Tr. 147) Dr. Bryan explained that, as a result of Plaintiff "extensive resection of a high-grade bladder tumor" and bladder cancer treatment, Plaintiff developed "significant lower urinary tract symptoms of voiding small amounts regularly which requires excessive trips to the bathroom." (Id.) Dr. Bryan also completed a questionnaire in which he opined that: Plaintiff had to use the restroom every sixty minutes; when he experienced urgency, he had about five to ten seconds "to get to the restroom"; and he could not complete a two-hour work period without using the restroom. (Tr. 148)

The ALJ reviewed Plaintiff's treatment records and noted that Plaintiff was "doing well without urinary complaints within a year" of completing the BCG treatments. (Tr. 15) In regard

8

to Dr. Bryan's medical opinion, the ALJ determined that it was "inconsistent with the treatment record" and "falls short of opining that the claimant is unable to work due to this condition." (Tr. 16) The ALJ concluded: "[T]here is no question that the claimant has these issues, but he manages this problem by wearing adult incontinency garments and this strategy would also be effective in the workplace." (Id.)

Plaintiff argues that the ALJ's finding that Plaintiff could maintain full-time employment wearing adult incontinency garments was not supported by medical evidence. However, Plaintiff's treatment records reflected significant improvement in Plaintiff's bladder problems over time. Indeed, Dr. Bryan last noted "occasional urgency and bladder spasm" in February 2015. Similarly, Plaintiff's most recent mention of bladder or related sleep problems to his primary care physician appear in his treatment records of March 2015. Dr. Bryan's treatment notes after February 2015 stated only that Plaintiff: was "doing well" (March 2015, April 2015, January 2016); had "no complaints" (October 2015); and had "no urinary complaints" (September 2015, December 2015, January 2016). Accordingly, the Court finds that "some medical evidence" supported the ALJ's finding that Plaintiff's urinary frequency and incontinence did not affect his ability to function in the workplace or require restrictions to his RFC.

While Plaintiff is correct Dr. Bryan's treatment notes contained no reference to adult incontinence undergarments, Plaintiff testified about them at the hearing. More specifically, Plaintiff stated that he made it to the bathroom "most of the time" and generally wore adult incontinence undergarments, so that his incontinence did not require him to change clothes. In light of this testimony and the evidence that Plaintiff had not complained of urinary urgency or incontinence to his treating physicians in almost two years, the ALJ did not err in omitting from the RFC any limitations for Plaintiff's use of the bathroom.

9

Next, Plaintiff claims that ALJ erred in discounting his subjective complaints. If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8. See also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain).

When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also SSR 16-3p, at 2017 WL 5180304, at *11.

In this case, the ALJ found that, while Plaintiff's "medically determinable impairments could reasonably be expected to produce" the symptoms he alleged, Plaintiff's statements "concerning the intensity, persistence, and limiting effects" of those symptoms was not consistent with the medical evidence and other evidence in the record. As previously discussed in regard to Plaintiff's urinary incontinence, Plaintiff's treatment records did not reflect any complaints since after March 2015. As to the degenerative joint disease in Plaintiff's left hand, the ALJ discounted those complaints because his recent examinations showed "full nonrestrictive range of motion of the wrist" and "good resolution from the majority of the symptoms." (Tr. 15)

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir.2008); accord Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir.2011). Having carefully considered Plaintiff's arguments to the contrary, the Court finds that the ALJ's credibility determination is supported by good reasons and is affirmed.

## VI.  Conclusion

For the foregoing reasons, the Court finds there is substantial evidence in the record to support the ALJ's decision.  Accordingly,

**IT IS HEREBY ORDERED** that, the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

*Patricia L. Cohen*
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2020